IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03456-RM-NYW

LAURA HOPPER,

      Plaintiff,

v.

RE/MAX PROPERTIES, INC.,
JEFF RYDER,
JODY ROMNEY, and
AMY LASSEN,

      Defendants.

---

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
REGARDING DEFENDANTS' MOTIONS TO DISMISS**

---

Magistrate Judge Nina Y. Wang

      This matter comes before the court on Defendants Re/Max Properties, Inc. ("Re/Max"), Amy Lassen, and Jody Romney's (collectively, "Re/Max Defendants") Motion to Dismiss ("Re/Max Motion to Dismiss"). [#20, filed March 4, 2015]. Also before the court is *pro se* Defendant Jeff Ryder's Motion to Dismiss ("Ryder Motion to Dismiss"). [#22, filed March 9, 2015]. These Motions were referred to the undersigned Magistrate Judge pursuant to the Order of Reference dated January 27, 2015 [#13] and the memoranda dated March 5, 2015 [#21] and March 17, 2015 [#27]. After carefully considering the Motions and related briefing, the entire case file, and the applicable case law, I respectfully RECOMMEND that the Re/Max Motion to Dismiss be GRANTED IN PART AND DENIED IN PART and that the Ryder Motion to Dismiss be GRANTED.

**BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff Laura Hopper ("Plaintiff" or "Ms. Hopper") initiated this lawsuit on December 23, 2014, asserting a claim for gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) ("Title VII"), as well as dual claims for Tortious Interference with Contractual Relations as to Defendants Romney and Lassen.  [#1].  The Complaint sought an unspecified sum of monetary damages, punitive damages, costs, and attorney fees.  [*Id.* at 11].  This court exercises supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

The Re/Max Defendants filed a Motion to Dismiss on January 21, 2015 [#8] and Defendant Ryder filed a Motion to Dismiss on February 10, 2015 [#15].  On February 10, 2015, this matter was reassigned to the undersigned Magistrate Judge.  [#16].

On February 11, 2015, Ms. Hopper filed an Amended Complaint in which she specified that the Gender Discrimination claim and Retaliation claim were asserted as to Defendant Re/Max, added a claim for Intentional Interference with Business Relationship as to Jeff Ryder, and pled two claims of Intentional Interference with Business Relationships as to Defendants Romney and Lassen in lieu of the Tortious Interference claims.  [#19].

This court held a Scheduling Conference on March 17, 2015, at which the undersigned ordered the Parties to complete discovery by September 20, 2015 and file dispositive motions on or before October 17, 2015.  [#28 and #29].

The following facts are drawn from the Complaint, and are taken as true for the purposes of considering the instant motion.  Defendant Re/Max is an "employer" as defined in Title VII, 42 U.S.C. § 2000e(b).  [#19 at ¶ 2].  At all times relevant to the Amended Complaint, Defendant Ryder was an Associate Broker for Re/Max, Defendant Romney was an Office Manager for

Re/Max, and Defendant Lassen was a Re/Max employee and Assistant to Joe Clement, who owned and operated the Re/Max office where the Parties were employed. [*Id.* at ¶¶ 3-6]. Defendant Ryder operated the Jeff Ryder Team, which is a Re/Max brokerage firm. [*Id.* at ¶ 4]. Beginning in November 2011, and at all times relevant to the Amended Complaint, Plaintiff worked in Joe Clement's Re/Max office in Colorado Springs, Colorado as an Assistant to Defendant Ryder. [*Id.* at ¶¶ 4, 7]. Plaintiff served simultaneously as a Re/Max and Ryder Team employee, although Re/Max issued her business cards, a telephone number, and an office, listed her on the Re/Max roster, and referred to her as a Re/Max employee. [*Id.* at ¶¶ 6, 7].

In August 2012, Defendant Lassen and Defendant Romney disseminated an "Assistant's Rules of Conduct" that required assistants to "wear pantyhose and not wear open toed shoes." [#19 at ¶ 8]. Neither Plaintiff nor a majority of her fellow assistants signed the document that accompanied the new Rules of Conduct. [*Id.*]

In late September 2012, Plaintiff learned that an anonymous employee had lodged a complaint about her attire, criticizing her hairstyle, the height of her heels, and the length of her skirt, and stating that she "need[ed] to tone down the sexuality, for [her] own good, not just ours." [#19 at ¶ 9]. The following June, in response to an additional complaint regarding Plaintiff's attire, Joe Clement asked Re/Max agent Ted Bachara to speak to Plaintiff about her dress and appearance at work. [*Id.* at ¶10]. Plaintiff sought to confront the agent who had lodged the second complaint, learned the woman was out of the office, and spoke with her assistant, Linda Deming. As they spoke, a staff member passed by them wearing a short skirt and Plaintiff drew a comparison between herself and the other staff person. Ms. Deming responded, "Well, Laura, she is much younger than you and what you wear is not age

appropriate." [*Id.* at ¶ 11]. Plaintiff asked why other employees had not been subject to complaints and Ms. Deming did not respond.

On July 3, 2013, a day after their conversation, Ms. Deming circulated an email to Joe Clement's immediate staff with inaccurate information regarding her conversation with Plaintiff. [#19 at ¶ 12]. Defendant Ryder responded to Ms. Deming, "We don't agree with everything in this email, and it seems the only way to come to a solution is to get all of the principal people in the same room to talk." [*Id.*] On July 6, 2013, Plaintiff informed Ryder that she had felt compelled to purchase a new wardrobe consisting of pants, blouses, a blazer, skirts, and a dress. [*Id.* at ¶ 13].

On July 12, 2013, Defendants Lassen and Romney visited Plaintiff at her office. Lassen "stuck her finger in Hopper's face and yelled that they 'were intervening to save [her] ass' because Clement wanted her gone." [#19 at ¶ 14]. She told Plaintiff that she needed to "change [her] sexy attire," then she and Romney repeatedly stated to Plaintiff that she cannot "dress sexy, think sexy, or breathe sexy." [*Id.*] Lassen next "pulled her shirt up above her chest, exposed herself, and said, '[i]f I sat in front of Joe [Clement] like this, what do you think would happen?'" [*Id.*] Romney then rose from her chair, hiked her skirt up around her waist, and instructed Plaintiff not to wear skirts "like this." [*Id.*] Romney also told Plaintiff to "tape her nipples or buy really padded bras," and that she would fire Plaintiff if she "messed up once." [*Id.*] Plaintiff immediately complained to another Re/Max agent about this exchange. [*Id.*]

Plaintiff alone received an email from Defendant Lassen on July 15, 2013, stating that Lassen had formalized a new dress code and was waiting for Joe Clement to approve it. [#19 at ¶ 15]. Ten days later, Plaintiff met with Tony Clement, Joe Clement's son, and spoke with him about her meeting with Defendants Lassen and Romney. At the time, Plaintiff was wearing "a

short dress, leggings, and high heels," which represented her normal attire.  [*Id.* at ¶ 16].  Tony told her she looked fine and that the new dress code would be fair.  [*Id.*]

On August 2, 2013, Joe Clement emailed that he and his team had formalized the new dress standards "to make sure all agent's assistants [sic] are dressed in a manner that promotes professionalism."  [#19 at ¶ 17].  The new dress code included a "three strike rule," which provided that an employee could be dismissed after the third write-up.  [*Id.*]

On August 5, 2013, after Defendant Ryder had approved Plaintiff's outfit for the day, she received an email from Tony Clement with her first warning of a dress code violation on the basis that her skirt was shorter than three inches above her knee.  [#19 at ¶ 18].  Tony, accompanied by Ryder and a third agent, entered Plaintiff's office and placed a measuring stick against Plaintiff's leg to gauge the length of her skirt.  [*Id.*]  Plaintiff's skirt length did not violate the dress code.  Tony then began criticizing the rest of her outfit, and scoffed, "the only places I have ever seen women wearing shoes like yours were places where they are naked."  [*Id.*]  The third agent remarked on the offensive nature of the comment, to which Tony did not respond. [*Id.*]  At an Agent Council meeting on August 7, 2013, Ryder identified to Tony and Joe Clement another agent who was wearing a short skirt, and said that if she and Plaintiff stood next to each other it would be Plaintiff who would receive the dress code warning.  [*Id.* at ¶ 19].  The Clements shrugged in response.  [*Id.*]

Plaintiff received her second dress code write up on August 21, 2013, wearing the same skirt that Tony Clement had measured on August 5.  [#19 at ¶ 20].  The following day, Defendant Ryder suggested to Plaintiff that she shop for new clothes with another agent's wife, and explained that Plaintiff had been written up a second time because Tony thought the skirt was too tight.  [*Id.* at ¶ 21].  Plaintiff protested against purchasing more new clothes, to which

Ryder responded that he could not "fight the establishment," that Plaintiff had brought this upon herself, and needed to conform.  [*Id.* at ¶ 22].

Plaintiff informed Defendant Ryder and the Clements on August 27, 2013 that she intended to file a complaint with the EEOC.  [#19 at ¶ 23].  Plaintiff alleges that Defendants Romney and Ryder and Ryder's other assistant David Smith subsequently created a threatening, inappropriate, and discriminatory work environment for her.  [*Id.* at ¶ 24].  Mr. Smith called Plaintiff a "f****** b****" on September 6, 2013, after which she attempted to contact Ryder, who would not respond.  [*Id.* at ¶ 25].

In preparing to leave the country for vacation, Defendant Ryder instructed Mr. Smith to change offices to a different building away from Plaintiff.  [#19 at ¶ 26].  Ryder told Smith that "slamming doors, raising voices, using profanity, intruding into someone else's workspace, etc…is embarrassing and will not be tolerated."  [*Id.*]  Smith moved office buildings during the morning of September 7, 2013, and three hours later returned to the office adjacent to Plaintiff's.  [*Id.* at ¶27].  Smith then began reporting Plaintiff's whereabouts to various other employees and staff.

On September 11, 2013, Plaintiff wore a blue dress to work that was in compliance with the dress code.  Plaintiff wore an identical black dress the following day.  Associate Broker Jeff Johnson, who was filling in for Ryder, told Plaintiff he had received complaints from Defendants Lassen and Romney and Tony Clement about her dress.  [#19 at ¶ 28].  Tony told Mr. Johnson that Plaintiff needed to be disciplined for the dress.  Mr. Johnson emailed Joe Clement that he had seen Plaintiff in the same dress the previous day, that it was one or two inches above the knee, looked "fine and appropriate," and did not violate the dress code.  [*Id.* at ¶ 28].

Plaintiff suffered an injury at work on August 14, 2013.  Following a meeting with the Clements, Defendant Ryder told Plaintiff to "go look at the poster in the kitchen and figure it out by yourself."  [#19 at ¶ 29].  Plaintiff initiated a workman's compensation case on September 10, 2013.  [*Id.*]  She discovered on September 25, 2013, that she was being electronically monitored by a camera at work.  [*Id.* at ¶ 30].  Ryder and the Clements fired her the same day.  A short time later, Plaintiff attempted to apply for a position with a different agent, who informed her that he had spoken with Defendant Romney and Joe Clement, and Joe Clement had advised him against hiring her.  [*Id.* at ¶ 32].

Plaintiff filed discrimination and retaliation charges with the Equal Employment Opportunity Commission ("EEOC") on September 10, 2013 and October 14, 2014, and received a Notice of Right to Sue on September 30, 2014.  [#19 at ¶¶ 1-2].

The Re/Max Defendants filed the pending Motion to Dismiss on March 4, 2015 [#20] and Defendant Ryder filed the additional pending Motion to Dismiss on March 9, 2015 [#22].  Plaintiff filed a Brief in Opposition to the Motions to Dismiss on March 25, 2015.  [#31].  The Re/Max Defendants filed their Reply on April 8, 2015 [#33].  Defendant Ryder did not file a Reply.  The instant motions are ripe, and this court has determined that oral argument would not materially assist in its disposition.

## STANDARD OF REVIEW

Under Rule 12(b)(6) a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations … and view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).

However, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008) (citation omitted). "The burden is on the plaintiff to frame 'a complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Id.* The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

Defendant Ryder is proceeding *pro se*. "A *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). However, the court cannot be a *pro se* litigant's advocate. *Yang v. Archuleta*, 525 F.3d 925, 927 n. 1 (10th Cir. 2008).

## ANALYSIS

### I.   Title VII Discrimination

Plaintiff claims that Defendant Re/Max willfully and intentionally discriminated against her because of her sex. To prevail on a Title VII claim under the burden-shifting test in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the claimant must establish a prima facie case of discrimination by demonstrating: (1) she belongs to a protected class; (2) she suffered adverse employment action; and (3) the adverse action occurred under circumstances giving rise to an inference of discrimination.  *See E.E.O.C. v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007).  *See also Barlow v. C.R. England, Inc.,* 703 F.3d 497, 505 (10th Cir. 2012) ("[P]laintiff's articulation of his prima facie case may vary depending on the nature of the claim," however, "[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination.").  Although Plaintiff does not have to establish a prima facie case of discrimination in her Complaint to survive the Re/Max Motion to Dismiss, the court nonetheless looks to "the elements of each alleged cause of action to help determine whether Plaintiff has set forth a plausible claim." *Khalik v. United Air Lines*, 671 F.3d 1188 (10th Cir. 2012).

Title VII prohibits discrimination against any individual "with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 21 (1993) (citing 42 U.S.C. § 2000e–2(a)(1)).  "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 79 (1998) (quoting *Harris*, 510 U.S. at 25).  This framework guides the court's consideration as to whether Plaintiff has set forth a plausible claim of sex discrimination that can survive a challenge pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Re/Max argues that Plaintiff does not sufficiently plead it was her employer, and her assertions that she "was a joint employee of Re/Max and Ryder Team during all relevant time

periods," and that "Re/Max and the Ryder Team co-determined the essential terms and conditions of Hopper's employment" are inadequate and conclusory in nature.  [#20 at 10-11; #19 at ¶ 7].  Re/Max avers that the following allegations demonstrate that Defendant Ryder exercised control over Plaintiff's employment: (1) The Jeff Ryder Team is an independent brokerage firm that chose its location of operation; (2) The Jeff Ryder Team employed its own assistants; (3) Ryder determined at which office location members of the Jeff Ryder Team assistants worked and assigned them offices; and (4) Ryder counseled his assistants regarding their attire and behavior.  [#20 at 11-12].

Re/Max correctly states that a *prima facie* case of discrimination under Title VII requires proof that the defendant was the plaintiff's employer.  *Knitter v. Corvias Military Living, LLC,* 758 F.3d 1214, 1225 (10th Cir. 2014) ("If a plaintiff cannot meet her burden to prove the defendant was her employer, her wage discrimination and retaliatory termination claims necessarily fail.").[1]  The *Knitter* court outlined the appropriate test to apply when the court is confronted with the question of "which one(s) of multiple individuals or entities is (are) the plaintiff's employer."  *Id.*  "Under the joint employer test, two entities are considered joint employers if they 'share or co-determine those matters governing the essential terms and conditions of employment.'"  *Id.* at 1226 (quoting *Bristol v. Bd. of Cnty. Comm'rs,* 312 F.3d 1213, 1218 (10th Cir. 2002)).  Additionally, the entities in question are joint employers if they

---

[1] Re/Max cites *Knitter* for support that Plaintiff has no remedy under Title VII because Re/Max was not her employer within the meaning of the statute.  However, the district court in *Knitter* (and indeed in most of the cases Re/Max cites) resolved the employer question on a motion for summary judgment, rather than under the Rule 12(b)(6) standard.  While the court granted defendants' motion to dismiss on the employer question in *Park v. Fiserv Trust Co.*, No. 10–cv–00189–PAB–CBS, 2010 WL 5093796, at * 2 (D. Colo. September 30, 2010), it did so because plaintiff failed to differentiate between the potential employer defendants and their conduct and asserted no allegations that any of the defendants co-determined the essential terms and conditions of employment.

both "exercise significant control over the same employees." *Id.* ("An independent entity with sufficient control over the terms and conditions of employment of a worker formally employed by another is a joint employer within the scope of Title VII.") (quoting *Sizova v. Nat'l Inst. of Standards & Tech.,* 282 F.3d 1320, 1330 (10th Cir. 2002)). The most important consideration in determining which entity has control over the terms and conditions of an employment relationship "is the right to terminate it under certain circumstances…" *Knitter*, 758 F.3d at 1226 (quoting *Bristol*, 312 F.3d at 1219). The court may also consider the entities' ability to "promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; ... day-to-day supervision of employees, including employee discipline; and ... control of employee records, including payroll, insurance, taxes and the like." *Id.* (quoting *Butterbaugh v. Chertoff,* 479 F. Supp. 2d 485, 491 (W.D. Pa. 2007)).

This court disagrees that Plaintiff has asserted only conclusory allegations to support that Re/Max was her employer. Plaintiff worked as an assistant to Defendant Ryder, a Re/Max broker, on the Jeff Ryder team. Plaintiff alleges that Re/Max issued her business cards, a telephone number, and an office, listed her on the Re/Max roster, and referred to her as a Re/Max employee. [#19 at ¶¶ 6, 7]. Defendant Ryder may have counseled her on her work attire, but so did Tony Clement [*see, e.g.* #19 at ¶¶ 16, 18]; and Tony's father, Joe Clement, instructed an agent other than Defendant Ryder to speak with Plaintiff about her work appearance. [#19 at ¶ 10]. When Ryder was out of town on vacation he was temporarily replaced with an agent who reported to Tony Clement. [#19 at ¶ 28]. Furthermore, Plaintiff alleges that Defendant Ryder *and* the Clements terminated her employment, after Defendant Romney, the Re/Max Office Manager, had threatened to fire her. [#19 at ¶¶ 14, 31]. Indeed, the Clements were responsible for implementing the assistants' dress code, which provided that an assistant may be dismissed

11

after three warnings, and Tony Clement issued Plaintiff's first warning for a dress code violation. [#19 at ¶¶ 17,18]. Although Plaintiff has not identified who was responsible for her salary, she has alleged that Re/Max through the actions of the Clements had the authority to supervise, discipline, and terminate her. *See Knitter*, 758 F.3d at 1231 (considering authority to terminate, pay, supervise, and discipline as paramount in determining the essential terms and conditions of employment). Viewing the facts in the light most favorable to Plaintiff, and mindful that whether an entity is an employer is generally a question for the jury (*see Bristol*, 312 F.3d at 1221), I find that Ms. Hopper has sufficiently alleged that Re/Max was, at the very least, her joint employer.

The outcome remains the same under the single-employer analysis, which the court uses when confronted with "whether two nominally separate entities should in fact be treated as an integrated enterprise." *Knitter*, 758 F.3d at 1226-27. The single-employer test focuses on the relationship between the two potential employers and weighs four factors: interrelations of operation; common management; centralized control of labor relations; and common ownership and financial control. *Id.* at 1227. The question of centralized control of labor relations is the most important prong of the single-employer analysis. *Leverington v. City of Colorado Springs,* 643 F.3d 719, 732 n. 9 (10th Cir. 2011). While Defendant Ryder could choose the location of his operations, Plaintiff's allegations demonstrate that he established his team within Joe Clement's Re/Max office. Plaintiff's allegations further indicate that Defendant Ryder deferred to the Clements on disciplinary matters and either co-managed his team members with the Clements or took management direction from the Clements. [*See, e.g.,* #19 at ¶ 19 ("At a meeting Ryder identified to the Clements another agent who was wearing a short skirt, and said

that if she and Plaintiff stood next to each other it would be Plaintiff who would receive the dress code warning.  The Clements shrugged in response.")].

The Re/Max Defendants' Motion to Dismiss does not expressly challenge Plaintiff's Second Claim for Retaliation.  Because the Motion to Dismiss is not styled as partial and was not accompanied with the filing of an Answer, I infer that the argument regarding Re/Max's employment status pertains equally to the Retaliation claim.  For the reasons addressed above I recommend denying Re/Max's Motion to Dismiss as to these two claims.

## II.     State Law Claims

Plaintiff also brings state claims for Intentional Interference with Business Relationship as to Defendants Ryder, Romney, and Lassen.  [#19 at 10-11].  The court may exercise supplemental jurisdiction over state law claims in any case in which it exercises original jurisdiction, and may also decline to exercise supplemental jurisdiction over state law claims when the district court has dismissed all claims over which it has original jurisdiction.  Given my findings with respect to Ms. Hopper's federal claims, I respectfully recommend that this court exercise jurisdiction over her remaining state law claims for Intentional Interference with Business Relationship and consider the pending Motions to Dismiss.

Plaintiff claims that Ryder, Romney, and Lassen each knew of her employment contract with Re/Max and that their interference with her ability to perform under that contract resulted in her termination.[2]  "One who intentionally and improperly interferes in the performance of a

---

[2] Plaintiff also claims that Romney interfered with her attempts to obtain employment with another buyer's agent.  But Plaintiff does not allege that she had an existing contract with the unnamed buyer's agent, nor does she assert any claim for tortious interference with prospective business relations.  [#19].  Therefore, the averment appears to be unrelated to the substantive claims.  In addition, as the Re/Max Defendants note, Plaintiff alleges that *Joe Clement* warned the prospective employer/agent not to hire her.  As to Defendant Romney, Plaintiff alleges only that the prospective employer "had a conversation with Jody Romney and Joe Clement."  [#19 at

contract between another and a third person is liable in tort to the other for the pecuniary loss resulting from the nonperformance of the contract." *W.O. Brisben Companies, Inc. v. Krystkowiak*, 66 P.3d 133, 136 (Colo. App. 2002) (citing *Trimble v. City & County of Denver*, 697 P.2d 716, 726 (Colo. 1985)).  Tortious interference with a prospective business relation requires a showing of intentional and improper interference preventing formation of a contract. *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 500 (Colo. 1995) (citing *Dolton v. Capitol Fed. Sav. & Loan Ass'n,* 642 P.2d 21, 23 (Colo. App. 1981)).

To prevail on a claim for intentional interference with a contract or business relationship, Plaintiff must establish that (1) she had a contract with another party, (2) Defendants knew or should have known of such contract, (3) Defendants intentionally induced the non-performance of the other party to the contract, and (4) Defendants' actions resulted in Plaintiff's damages. *Lutfi v. Brighton Community Hosp. Ass'n*, 40 P.3d 51, 58 (Colo. App. 2001) (citing *Telluride Real Estate Co. v. Penthouse Affiliates, LLC,* 996 P.2d 151 (Colo. App. 1999).  An agent who, while acting in the scope of his or her official duties, causes the principal to breach a contract will generally not be held liable for tortious interference with that contract.  *W.O. Brisben Companies, Inc.*, 66 P.3d at 136 (citing *Cronk v. Intermountain Rural Electric Ass'n,* 765 P.2d 619, 623 (Colo. App. 1988)).  *See also Larry v. Penn Truck Aids, Inc.*, 567 F.Supp. 1410, 1416 (E.D. Pa. 1983) ("The aggrieved party already has a claim against the corporate principal for breaching the [contract]. Where the individual agent of the corporation is acting in the best interest of his principal, nothing is gained by recognizing, in addition, a cause of action against the individual for inducing the breach.").  In circumstances where agents acting within the scope

---

¶ 32].  Even if Plaintiff had stated a claim for interference of a prospective contractor, these allegations simply do not support a finding of interference, let alone that the interference was improper.

of their official duties are held liable for interfering with their principals' contractual relations, the question is not whether the agent intended to interfere or knew that his or her actions would result in interference, but whether the agent acted "improperly" in doing so. *W.O. Brisben Companies, Inc.*, 66 P.3d at 136 (citing *Trimble*, 697 P.2d at 720-21, 725-27) (agent acted improperly by abusing administrative authority to fire employee because of personal hostility, rather than bona fide organizational purposes).

Defendants Romney and Lassen argue that Plaintiff has merely recited the elements of the claim without alleging any facts in support, and specifically that she has not alleged the requisite personal animus. [#20 at 16]. Defendant Ryder submitted a three-page Motion to Dismiss, averring that he never employed Ms. Hopper, she was employed by Peak Home Solutions, Inc., and Peak Home Solutions, Inc. "is an S- Corporation with one employee and does not fall under Title VII." [#22].

Plaintiff unequivocally pleads she entered into a contract for employment with Re/Max. [#19 at ¶ 35]. She also alleges that Defendants Ryder, Romney, and Lassen respectively knew or should have known that she had a contract for employment with Re/Max. [*Id.* at ¶¶ 50, 55, 61]. And she alleges that she has been damaged by the alleged interference. [*Id.* at ¶¶ 53, 59, 64]. Therefore, for the purposes of the instant Motion, the only element of the claim in dispute (and indeed, the only element that Defendant Romney and Lassen argue) is whether Defendants Ryder, Romney, and Lassen improperly interfered with the contract.

In determining whether a person acts "improperly" in interfering with the contract the court should consider the following factors: "(1) the nature of the person's conduct; (2) the person's motive; (3) the interests of the other with which the person's conduct interferes; (4) the interests sought to be advanced by the person; (5) the social interests in protecting the person's

freedom of action and others' contractual interests; (6) the proximity or remoteness of the person's conduct to the interference; and (7) the relations between the parties." *W.O. Brisben Companies, Inc.*, 66 P.3d at 136 (citing *Trimble*, 697 P.2d at 726).  At the pleading stage, a plaintiff must assert sufficient facts beyond ones that make a claim a mere possibility.  *Bell Atlantic Corp.  v. Twombly*, 550 U.S. 544, 557-58 (2007).  While detailed factual allegations are not required, mere labels and conclusions will not suffice.  *Ashcroft v. Iqbal*, 556 U.S. 662 (2007).  I find that Plaintiff has not provided sufficient factual allegations to transform her claims from conceivable to plausible – particularly post-*Iqbal/Twombly*.

Ms. Hopper's allegations demonstrate that the issues with her workplace attire originated with Joe Clement, rather than the Defendants. *See e.g.,* [#19 at ¶¶ 14, 28, 29].  Accepting those allegations as true, Defendants Ryder, Romney, and Lassen—all of whom reported to Joe Clement, the owner of the Re/Max location [*id.* at ¶ 4] or his son, Tony Clement—did not interfere with Re/Max's performance of the contract; rather, they enforced the Clements' orders. *See e.g.*, [*id.* at ¶¶ 21-22].  Lassen and Romney visited Plaintiff on July 12, 2013 with the purpose of "intervening" with regard to her attire because "Clement wanted her gone." [*Id.* at ¶ 14].  Although Romney threatened to fire Plaintiff if "she messed up once" [*id.*], it is clear that pressure for Plaintiff to change her appearance emanated from the Clements.  The fact that Lassen emailed only Plaintiff with news that she had formalized a dress code and was waiting for Joe Clement's approval [*id.* at ¶ 15] is indicative of very little.  Lassen could have emailed that message to other individual staff, and the correspondence could be viewed as merely alerting Plaintiff that new rules would soon be implemented.  Ryder apparently defended Plaintiff to Ms. Deming when he responded to her July 3, 2013 email that "[w]e don't agree with everything in [your] email"; and again at an Agent Council meeting when he gestured to an employee wearing

a short skirt and observed to the Clements that if Plaintiff stood next to that employee, only Plaintiff would be disciplined.  [#19 at ¶¶ 12, 19].  He also advised Plaintiff to "pick out some new clothes" with another agent's wife, recognizing that the Clements were scrutinizing her wardrobe.  [#19 at ¶ 21].  Ryder even assigned his assistant, Mr. Smith, to another office building to prevent him from harassing Plaintiff.  [#19 at ¶ 26].

These allegations speak to the nature of Defendants' conduct and the interests of the Clements and Defendants in having Plaintiff conform to the dress code.  *See W.O. Brisben Companies, Inc.*, 66 P.3d at 136 ("In the agency context, the analysis focuses on whether the agent acted, in part at least, to serve the corporation's interests") (citation omitted).  None of the allegations as pled suggest that the Defendants were interfering in an otherwise sound relationship between Plaintiff and Re/Max.  In addition, the allegations do not establish that Defendants acted with malice or with intent to harm Plaintiff; rather, the allegations suggest that Defendants were acting upon orders of their supervisors.  *Cf. Meehan v. Amax Oil & Gas, Inc.*, 796 F.Supp. 461, 465 (D. Colo. 1992) ("Colorado courts have looked to whether the defendant acted in good faith to serve the corporation's interests and whether the defendant acted with malice towards the plaintiff or was motivated by a desire to harass or retaliate against the plaintiff"); *Ayon v. Kent Denver School*, No. 12–cv–2546–WJM–CBS, 2013 WL 1786978, at *5 (D. Colo. April 26, 2013) (granting motion to dismiss in part because plaintiff did not plead specific facts that defendant acted with "independent, external and personal motive to do harm to her employment contract.").  While Defendants' conduct and the alleged interference are close in time, Plaintiff fails to plead sufficient acts of a plausible inference that Defendants sought to harm Plaintiff, rather than to enforce the dress code so as to protect the organization's reputation or their own contractual interests in remaining employed by the Clements.  This court would

reach too far to conclude that Defendants, on the basis of the Amended Complaint, were motivated "solely by the desire to harm [Plaintiff] or to interfere in the contractual relations between the parties." *W.O. Brisben Companies, Inc.*, 66 P.3d at 137 (citing *Trimble*, 697 P.2d at 726).

## CONCLUSION

For the foregoing reasons, this court RECOMMENDS that the Re/Max Defendants' Motion to Dismiss [#20] be GRANTED IN PART and DENIED IN PART and that Defendant Ryder's Motion to Dismiss [#22] be GRANTED.[3]

---

[3] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED: June 12, 2015                    BY THE COURT:


                                        s/Nina Y. Wang_____
                                        United States Magistrate Judge