**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Case No. 14-cv-03456-RM-STV

LAURA HOPPER,

      Plaintiff,

v.

RE/MAX PROPERTIES, INC.,

      Defendant.

---

## OPINION AND ORDER

---

On February 11, 2015, plaintiff Laura Hopper ("plaintiff") filed an Amended Complaint against defendant Re/Max Properties, Inc. ("defendant"), alleging claims of gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").  (ECF No. 19).[1]

Pending before the Court is defendant's motion for summary judgment ("the motion for summary judgment") (ECF No. 79) and statement of undisputed material  facts (ECF No. 79-1). Plaintiff has filed a response in opposition to the motion for summary judgment (ECF No. 86), a response in opposition to defendant's statement of undisputed material facts (ECF No. 86-1), and, *inter alia*, affidavits from herself (ECF No. 86-2) and Theodore Bachara ("Bachara") (ECF No. 86-5).  Defendant filed a reply (ECF No. 93) and a reply statement of undisputed material facts

---

[1] Plaintiff also brought claims against three other defendants, but they were each dismissed from this action on July 24, 2015, pursuant to the Court's Order adopting the Magistrate Judge's Report and Recommendation.  (ECF No. 44.)

("the RSUMF") (ECF No. 93-1).  Defendant has also filed a motion to strike the two affidavits mentioned above ("the motion to strike") (ECF No. 94), to which plaintiff has responded (ECF No. 97) and defendant has filed a reply (ECF No. 98).

## I.     Motion to Strike

Before turning to the motion for summary judgment, the Court will first address defendant's argument that the affidavits of plaintiff ("plaintiff's affidavit") and Theodore Bachara ("Bachara's affidavit") should be stricken in part.  The Court will address each argument in turn.

Defendant, first, argues that paragraphs 6 and 7 of plaintiff's affidavit should be stricken because they contain hearsay.  (ECF No. 94 at 3.)  The Court disagrees.  Although, the paragraphs certainly contain statements from individuals other than plaintiff, in response to the motion to strike, plaintiff asserts that those statements are only being offered for the fact that they were made.  (*See* ECF No. 97 at 2-3.)  The Court takes plaintiff at her word, and will consider those statements, where relevant, only for the fact that they were made.

Defendant argues that paragraphs 10 and 11 of plaintiff's affidavit should be stricken because they contain either conclusory statements or make conclusions of law.  (ECF No. 94 at 3.)  The Court agrees with defendant except in one limited situation.  In paragraph 10, plaintiff asserts that "[w]omen were under video surveillance when they entered and left the building."  (ECF No. 86-2 at ¶ 10.)  To the extent this statement is meant to suggest that women, and *only* women, were under video surveillance, there is simply no evidence to support the same.  Based upon the Court's review of the parties' factual offerings, when viewed in plaintiff's favor, it appears that video surveillance did occur, but any such surveillance was of all individuals entering and leaving the building, rather than just women.  Thus, the Court will strike any mention of women being under surveillance, but

2

will still accept the proposition that individuals were under video surveillance when they entered and left the building.

Plaintiff also asserts in paragraph 10 that she was "aware" that a male employee came into work in violation of a dress code. (*Id*.) Although the word "aware" is vague, the Court will accept the proposition that plaintiff personally saw this alleged event, and thus, will not strike that statement. As for defendant's other arguments with respect to these paragraphs, the Court agrees that the remainder of paragraphs 10 and 11 are replete with conclusory statements or legal conclusions that are based upon plaintiff's speculative belief rather than her own personal knowledge. Therefore, the remainder of those paragraphs will not be considered.

Defendant next argues that paragraph 12 contains statements that are contrary to her deposition testimony, and thus, should be considered as attempting to create a "sham" issue of fact. (ECF No. 94 at 4-6.) Specifically, defendant objects to plaintiff's statement that she believed various events occurred because of her gender, when, at her deposition, she testified that she did not know why those events occurred. (*Id*. at 4.) In response, plaintiff argues that her affidavit does not contradict her deposition testimony because the questions posed during the deposition asked her to speculate as to the motivation of certain individuals, rather than state her own view of the facts. (ECF No. 97 at 5.)

This dispute involves construction of certain questions asked to plaintiff during her deposition, and, in so constructing those questions, the Court agrees with plaintiff in large part. The pertinent deposition testimony (attached to the motion to strike) shows that plaintiff was asked a series of questions, which were preceded by lengthy statements from opposing counsel. At the end of those statements, plaintiff was asked questions such as the following: "Why do you think *Amy*

3

*Lassen* did all of those things to you?" (*See* ECF No. 94-2 at 192:14-15) (emphasis added). Other than the name of the individual, the questions are almost identical. (*See id*. at 192:4-6, 20:21, 193:7-8.) These questions are asking plaintiff why she thought *other people* acted the way they did. As such, the Court agrees with plaintiff that any answer from her would have required her to speculate as to the individuals' reasons for acting, assuming that those people did not actually tell her why they acted. The answer, "I don't know," is thus perfectly reasonable given the specific question asked. (*See id*. at 192:7, 16, 22, 193:9.) As such, the assertions in plaintiff's affidavit, about *her* belief as to whether certain statements were gender related, are not contrary to her deposition testimony. To the extent that defendant believes that plaintiff is now claiming that other people were motivated by her gender (*see* ECF No. 98 at 3), that is simply not how the Court has construed plaintiff's affidavit. Plaintiff's affidavit simply states that *she* believes certain statements were made due to her gender.[2] Whether or not there are any facts to support such a belief, or to show the potential motivation of the speaker, are entirely different issues.

Defendant next argues that paragraph 14 contains speculative conclusions. (ECF No. 94 at 4.) The Court agrees. Paragraph 14 essentially states that another person "could not have had a good faith belief" about something that person was told. (*See* ECF No. 86-2 at ¶ 14.) In her response, plaintiff makes no attempt to explain how she could have personal knowledge about the good faith beliefs of another person. (*See* ECF No. 97 at 6.) Even if the Court accepted as true that plaintiff talked with that person about the process for filing a workers' compensation claim, that does

---

[2] In the same paragraph, plaintiff also asserts that (1) the alleged singling out of women would have been evident to defendant due to the video surveillance, and (2) alleged disciplinary actions were unwarranted. Those statements will not be considered because they are either speculative or state a conclusion.

not support any statement concerning the person's good faith beliefs. However, to the extent plaintiff's assertion, that she discussed the process for filing a workers' compensation claim, is meant to be standalone, the Court will consider it as such, given that it appears to be made on personal knowledge.

This leaves defendant's objection to Bachara's affidavit. Defendant argues that paragraph 15 of that affidavit should not be considered because it contains uncorroborated conclusions of fact. (ECF No. 94 at 5.) In response, plaintiff asserts that paragraph 15 only concerns Bachara's personal knowledge of a purported "three-strike rule that gave Re/Max the right to fire assistants." (ECF No. 97 at 6.) Based upon plaintiff's response, it appears that plaintiff wishes to use paragraph 15 for the proposition that defendant had a right to fire assistants due to a "three-strike rule." To the extent that this proposition is based upon Bachara's "personal knowledge of the three-strike rule" (*id*.), it is really Bachara's *interpretation* of the three-strike rule, especially given that plaintiff concedes that Bachara's interpretation is not based upon any real-world firings of assistants (*see id*.). In other words, Bachara believes that the three-strike rule allows defendant to fire assistants. In that light, Bachara's interpretation is unnecessary, given that a jury can interpret the three-strike just as easily as Bachara appears to have done. Therefore, the Court will not consider paragraph 15 of Bachara's affidavit.

Accordingly, the Court GRANTS in part and DENIES in part defendant's motion to strike.

## II.    Legal Standard for Summary Judgment

Summary judgment is appropriate "when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Initially, the movant bears the "responsibility of informing the district court of the basis for its motion, and

identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). If this burden is met, then the non-moving party must set forth specific facts showing that there is a genuine dispute for trial. *Id*. at 324. A fact is material if it has the potential to affect the outcome of a dispute under applicable law. *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995). An issue is genuine if a rational trier of fact could find for the non-moving party. *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

In performing this analysis, the factual record and any reasonable inferences therefrom are construed in the light most favorable to the non-moving party. *Id*. However, a mere "scintilla of evidence" is insufficient to avoid summary judgment. *Turner v. Public Service Co. of Colorado*, 563 F.3d 1136, 1142 (10th Cir. 2009). Instead, a non-movant "must proffer facts such that a reasonable jury could find in her favor." *Id*.

## III.   Discussion[3]

### A.   "Employer" Status

The initial dispute between the parties is whether a cause of action under Title VII can be brought by plaintiff against defendant under the circumstances of this case. More specifically, the parties dispute whether defendant is an "employer" for purposes of Title VII. (ECF No. 79 at 3-7; ECF No. 86 at 3-7.)

### 1.   Pertinent Law

Despite their dispute, the parties agree that the law pertinent to this inquiry can be derived from the Tenth Circuit Court of Appeals' decision in *Knitter v. Corvias Military Living, LLC*, 758

---

[3] The pertinent undisputed facts are set forth in the Court's discussion.

6

F.3d 1214 (10th Cir. 2014).  (*See* ECF No. 86 at 3; ECF No. 93 at 2.)  In *Knitter*, the Tenth Circuit was faced with whether a company (Picerne Military Housing, LLC ("Picerne")) was the employer of the plaintiff Lisa Knitter ("Knitter") when Knitter worked for Lewis General Contracting, Inc. ("LGC").  *Id*. at 1217-18.  The Tenth Circuit began its analysis by explaining the relevant test when an employee of one entity seeks to hold another entity liable as an employer.  That test is known as the "joint employer test."  *Id*. at 1226.

"Under the joint employer test, two entities are considered joint employers if they share or co-determine those matters governing the essential terms and conditions of employment."  *Id*. (quotation omitted).  "Most important to control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances."  *Id*. (quotation and ellipsis omitted).  Additional factors considered include: the ability to promulgate work rules; set conditions of employment such as compensation, benefits, and hours; day-to-day supervision of employees, including employee discipline; and control of employee records, such as payroll and taxes.  *Id*.  In applying this test to the facts of the case, the Tenth Circuit concluded that no reasonable jury could find that Knitter was an employee of Picerne because the facts showed that Picerne did not have authority to terminate Knitter's employment, did not pay Knitter directly, and did not have authority to supervise and discipline Knitter "beyond the confines of a vendor-client relationship."  *Id*. at 1228.

With respect to payment, the Tenth Circuit explained that, although Picerne paid LGC a fee for Knitter's work, and LGC then paid a percentage of that fee to Knitter, Picerne had no control over how much of the fee was paid directly to Knitter.  *Id*. at 1220, 1229.  In addition, Knitter's paychecks came from LGC, and LGC maintained Knitter's personnel records including her W-2 forms.  *Id*. at 1229.  With respect to supervision, the Tenth Circuit explained that, although "[s]ome

degree of supervision and even discipline is to be expected when a vendor's employee comes on another business's work site," the limited supervision and discipline of Knitter weighed against finding Picerne as her joint employer. *Id*. at 1230. The Tenth Circuit noted that Picerne's supervision was "largely focused" upon workplace safety, including a dress code and safety harness requirements, which the Circuit explained were "natural[]" given that Knitter worked on Picerne's premises. The Tenth Circuit further explained that, although Picerne provided instruction on how to perform certain tasks and notified Knitter if her work did not meet its standards, this did not extend to matters such as training or formal performance evaluations. *Id*. In addition, the Tenth Circuit explained that, although Picerne may have threatened to discipline Knitter and may have collected a fee for not wearing a safety harness, this did not mean that Picerne had the actual authority to do discipline Knitter or that it disciplined her as to other matters. *Id*. at 1231.

The Tenth Circuit then concluded that, taking all of the factors together, the most important—authority to terminate—weighed heavily against Knitter, as did Picerne not paying her. *Id*. Moreover, even if Picerne had the authority to supervise elements of Knitter's work and enforce safety rules, this "limited control" was insufficient for a reasonable jury to find that Picerne was Knitter's joint employer. *Id.*

## 2.    Relevant Facts Here

Defendant is a real estate brokerage company. (ECF No. 93-1 at ¶ 1.) Jeff Ryder ("Ryder") is an independent contractor affiliated with defendant as the Jeff Ryder Team. (*Id.* at ¶ 2.) In November 2011, Ryder interviewed plaintiff at a Whole Foods grocery store in response to a Craigslist ad he placed seeking an assistant. (*Id.* at ¶ 4.) None of defendant's employees were present at Ryder's interview of plaintiff, and she did not interview with anyone from defendant. (*Id.*

at ¶ 5.)  Ryder hired plaintiff at the conclusion of the interview.  (*Id.* at ¶ 6.)  Defendant's policy

stated that all unlicensed assistants would meet with a broker manager before hiring.  (*Id.* at

¶ 1(AF).)[4]  Plaintiff, though, did not meet with a broker manager before being hired.  (*Id.*)

When assistants "check in" defendant reviews its rules of conduct with them.  (*Id.* at

¶ 2(AF).)  "Checking in" means, when an assistant is hired, meeting with a broker manager, and then

an office administrator.  (ECF No. 86-7 at 22:16-21.)[5]  The purpose of the check in process was to

review defendant's rules of conduct for assistants.  (*Id.* at 23:9-11, 24:16-24.)  Plaintiff was

presented with a code of conduct in July or August 2012.  (ECF No. 86-6 at 12:8-13:18.)  Ryder told

plaintiff that she did not need to sign a code of conduct or dress code issued in 2012.  (*Id.* at ¶¶ 29,

31.)  After checking in, an assistant is added to the company roster, and the company provides them

with an email account and a key to the building, which allows for after-hours entry.  (ECF No. 93-1

at ¶ 3(AF).)[6]  Assistants had to comply with defendant's rules.  (ECF No. 79-2 at 8:18-21.)

---

[4] Pursuant to the Court's Civil Practice Standards and an Order on August 24, 2016, plaintiff submitted 79 statements of additional fact.  (*See* ECF No. 80.)  In order to avoid confusion in referring to plaintiff's additional fact statements, which are numbered in the same fashion as defendant's (i.e., 1-79), the Court places the initials "(AF)" after factual statements raised as part of plaintiff's additional statements of fact.  Thus, for example, plaintiff's first factual statement will be 1(AF), and her twentieth 20(AF).

[5] For deposition transcripts, the Court cites the page number of the transcript itself, rather than the page number assigned by the CM/ECF system.

[6] This factual statement contains two sentences.  (*See* ECF No. 93-1 at ¶ 3(AF).)  The Court has been very liberal in its interpretation of plaintiff's factual statements, almost all of which contain multiple sentences, in terms of whether they contain one factual statement or multiple statements.  Although defendant objects on numerous occasions to the inclusion of more than one separate fact in a factual statement, construing the flow of the sentences liberally, the Court has found that on most occasions the sentences flow in a manner so that only one factual scenario is being presented.  However, that is not the case on all occasions, such as the instant paragraph.  In the first sentence, plaintiff states what happens after check in, in terms of being added to the company roster and receiving an email account and building key.  The second sentence states that assistants are required to attend new agent orientation.  Those two facts do not flow from one to the other; they are instead separate facts, which thus required separate factual statements.  Because plaintiff did not follow that procedure, the Court will only consider the first fact presented.  The second fact (i.e., new agent orientation) will not be considered.  Moreover, even if the Court were to consider it, plaintiff has presented no evidence that *she* actually attended new agent orientation.

The day after the interview, Ryder's assistant provided plaintiff with training.  (*Id.* at ¶ 7.) Plaintiff was trained on some of defendant's systems.  (*Id.* at ¶ 5(AF).)  Plaintiff had to know how to operate defendant's management system, and she had to turn in files and commission checks to defendant.  (*Id.*)[7]  Defendant provided plaintiff an office, but she could not recall who determined where she worked.  (ECF No. 86-6 at 78:15-16, 83:4-5.)[8]  Defendant provided office supplies for use in a common area.  (ECF No. 93-1 at ¶ 13(AF).)  Plaintiff's business card identified the names of defendant and the Jeff Ryder Team.  (ECF No. 86-11 at 29:4-14.)

Hopper managed a team of four to five individuals.  (ECF No. 86-6 at 53:20-22.)  Plaintiff's job duties included coordinating with buyers and sellers, scheduling with lenders, scheduling inspections, managing contracts for buying and selling, doing marketing for the Jeff Ryder Team, buying supplies, answering telephones, meeting with clients of the Jeff Ryder Team, making sure that the filing system was complete, submitting commission checks to defendant, making sure contracts were complete at closing, posting ads for properties, and making sure that deadlines were met.  (ECF No. 93-1 at ¶ 9.)  All of the above work tasks were done solely for the Jeff Ryder Team, and were assigned by members of the Jeff Ryder Team.  (ECF No. 86-6 at 70:21-23, 78:17-20.)

---

Plaintiff takes a similar strategy, in terms of cramming multiple separate facts into one factual statement, in paragraphs 12(AF) (with respect to taking contracts to Tony Clement) and 42(AF) (with respect to video surveillance).

[7] In this factual statement, plaintiff also asserts that there were required meetings.  (*See* ECF No. 93-1 at ¶ 5(AF).)  Although the Court does not necessarily agree, plaintiff provides no evidence as to what purpose the required meetings were held, and thus, the Court does not find this statement particularly helpful to its analysis.

[8] Defendant cites to plaintiff's Amended Complaint for the proposition that Ryder determined where his assistants worked.  (*See* ECF No. 93-1 at ¶ 19.)  However, the paragraph of the Amended Complaint to which defendant cites relates to Ryder telling a David Smith to move his office (*see* ECF No. 19 at ¶ 26), not *all* assistants.  Therefore, the cited evidence does not support defendant's factual statement.

Plaintiff could not recall if she reported work that she did to Tony Clement, defendant's broker manager. (*Id*. at 74:19-21; ECF No. 93-1 at ¶ 12.) Defendant kept a file on plaintiff. (*Id.* at ¶ 14(AF).)

From November 2011 through September 2013, plaintiff did not directly negotiate her salary with defendant, and Ryder's company—Ryder Realty Peak Home Solutions, Inc.—was the only company that provided plaintiff a paycheck and W-2 Form in connection with her work for the Jeff Ryder Team. (*Id.* at ¶¶ 13, 15-16.) Defendant did not provide plaintiff with a paycheck or a W-2 Form. (*Id.* at ¶¶ 15-16.) Ryder agreed to provide plaintiff with paid vacation and bonuses. (*Id.* at ¶ 14.) Defendant did not provide plaintiff with any benefits. (*Id.* at ¶ 17.)

Plaintiff received correspondence, dated September 20, 2013, from Ryder telling her to work from "8:30 to 5:30 and then go home." (ECF No. 79-5 at 1; ECF No. 93-1 at ¶ 18.)[9] After September 11, 2013, plaintiff's building key was restricted, so that she was only able to access the building at certain hours and not on weekends or after hours. (ECF No. 93-1 at ¶¶ 63-64(AF).) This restriction stopped plaintiff from doing her normal job for the Jeff Ryder Team. (*Id*.)

Plaintiff reported her weekly hours to Ryder on a time sheet. (*Id*. at ¶ 20.) Plaintiff submitted requests for time off to Ryder, and did not request time off from defendant. (*Id.* at ¶ 21.) From November 2011 through September 2013, Ryder Realty Peak Home Solutions, Inc. was the only company that approved requests for time off in connection with plaintiff's work for the Jeff Ryder Team. (*Id.* at ¶ 22.) Defendant did not approve any request for time off from plaintiff. (*Id*.)

---

[9] Plaintiff objects to paragraph 18 of the RSUMF on the ground that Ryder did not have sole control over her work hours because defendant restricted her key fob, which had the effect of setting her work hours. (*See* ECF No. 93-1 at ¶ 18.) However, the deposition testimony to which plaintiff cites does not support plaintiff's objection, given that she conceded during her deposition that she did not know who requested that her key fob be restricted. (*See* ECF No. 86-6 at 83:15-17.)

11

Plaintiff made complaints about issues in the office to Ryder and also, on some occasions, to Tony and Joe Clement. (*Id.* at ¶ 23.) Joe Clement was defendant's owner. (ECF No. 79-2 at 5:18-6:6.) Joe Clement never spoke with plaintiff, except to welcome her aboard shortly after she was hired. (ECF No. 93-1 at ¶ 62.) When plaintiff needed to file a worker's compensation claim, Ryder called Jody Romney ("Romney"), an office manager for defendant, asked what they should do, and Romney replied that there was a poster in the breakroom explaining the procedures. (*Id.* at ¶ 15(AF); ECF No. 79-24 at ¶ 1.)[10]

In late September 2012, plaintiff and Ryder met with Linda Richie ("Richie") from defendant's legal department to discuss a complaint received about the manner in which plaintiff dressed. (*Id.* at ¶ 32.) The complaint came from Terry Naber ("Naber"), a broker affiliated with defendant. (*Id.* at ¶ 33.) In part, Naber complained that a buyer had described plaintiff as "look[ing] like a hooker," and Naber himself said that the only place plaintiff's dress "might be appropriate would be a night club down on Tejon." (ECF No. 79-9 at 2.) Naber was concerned that plaintiff's dress "destroy[ed] years of our efforts at a public perception of the height of professionalism." (*Id.*) During the meeting with Richie, Ryder said that he would not take the complaint seriously because Richie would not identify the complainant. (ECF No. 93-1 at ¶ 34.) Plaintiff did not give the complaint any further thought because Ryder told her not to worry about it. (ECF No. 86-6 at 130:14-20.)

---

[10] The Court is not precisely aware of why this fact is relevant to the joint employer test, even though plaintiff relies upon on it. (*See* ECF No. 86 at 6.) Plaintiff does not attempt to explain why this fact is relevant (*see id.*), and the Court cannot understand why it is. Merely because there was a poster in the breakroom concerning worker's compensation procedures, does not mean that those procedures were defendant's or that defendant would be liable for any worker's compensation. In fact, the opposite appears true, given that plaintiff states that defendant did not cover plaintiff for worker's compensation (*see id.*), and the Colorado Department of Labor and Employment would not permit plaintiff to submit a claim for unemployment insurance against defendant (*see* ECF No. 93-1 at ¶ 77).

In March 2013, a third-party lender with whom defendant did business informed Romney that plaintiff was wearing a "skimpy" dress. (ECF No. 79-24 at ¶ 7.)  In June 2013, Bachara informed plaintiff that Tiffany Lachnidt had complained about plaintiff's dress. (ECF No. 86-6 at 139:18-22.)[11]  After speaking with Bachara, plaintiff bought new clothes, but, even with the new clothes, there were continued complaints about her dress. (ECF No. 79-3 at 144:4-12.)[12]  After receiving a number of complaints about plaintiff's attire, Romney and Amy Lassen ("Lassen") met with plaintiff on July 12, 2013. (ECF No. 93-1 at ¶ 46.)  After that meeting, plaintiff went to Ryder in tears due to the way she had been treated by Lassen and Romney. (*Id.* at ¶ 29(AF).)  Ryder was not told about the meeting or included in it. (*Id.*)[13]  Joe Clement spoke with Ryder "maybe a half dozen times" about plaintiff. (*Id.* at ¶ 23(AF).)  Joe Clement perceived Ryder as "soft and polite and gentle," and Ryder's conversations with plaintiff as not being with an iron fist to change. (*Id.*)

On August 2, 2013, Joe Clement issued an updated dress code that applied to all assistants employed by agents. (ECF No. 93-1 at ¶ 48.)  Compliance with the dress code was mandatory, and it was intended to project a professional image. (ECF No. 93-1 at ¶¶ 48, 33(AF).)  Under the dress code, the first infraction would be addressed with an email, asking the infringer to go home and change. (*Id.* at ¶ 33(AF).)  A second infraction also resulted in an email and a request to return home

---

[11] Plaintiff objects that defendant's citation does not support that Bachara informed plaintiff about complaints concerning her dress (*see* ECF No. 93-1 at ¶ 38), however, plaintiff's deposition testimony clearly reflects, even construing it in a light most favorable to plaintiff, that Bachara talked to plaintiff about complaints concerning her dress (*see* ECF No. 86-8 at 139:18-22).

[12] Plaintiff raises a similar objection to this factual statement as the one discussed in footnote 11 *supra*. (*See* ECF No. 93-1 at ¶ 39.)  For the same reason, i.e., that the deposition testimony clearly reflects that plaintiff was talking about her dress, the Court rejects the objection.

[13] In this factual statement, plaintiff also asserts that Ryder remembered her being brought to tears on a lot of occasions. (*See* ECF No 93-1 at ¶ 29(AF).)  However, as defendant states in response, the deposition testimony upon which plaintiff relies does not indicate who brought plaintiff to tears on those occasions. (*See id.*)  Therefore, the Court will not consider that part of the factual statement.

and change, as well as a meeting with the office manager.  A third infraction was grounds for

termination.  (*Id*.)  Ryder and plaintiff questioned how defendant could fire plaintiff under the dress

code when she did not work for defendant.  (ECF No. 79-7 at 45:19-46:2.)  Ryder thought defendant

was "stumped" by this and "didn't have an answer … because there didn't seem to be an avenue to

which they could fire her."  (*Id*. at 46:2-5.)

Tony Clement sent two emails to plaintiff for purportedly violating defendant's dress code

policy; the first on August 5, 2013, and the second on August 21, 2013.  (ECF No. 93-1 at ¶¶ 50, 52;

ECF No. 79-17 at 1; ECF No. 79-19 at 1.)  Tony Clement did not speak with Ryder before sending

the first and second emails.  (*Id.* at ¶¶ 38(AF), 43(AF).)  Tony Clement had the authority to issue the

emails.  (*Id.* at ¶ 45(AF).)[14]  In both emails, plaintiff was instructed "to go home and change."  (ECF

No. 79-17 at 1; ECF No. 79-19 at 1.)  Plaintiff was never sent home to change after either email

because Ryder concluded that her dress was not in violation of the dress code.  (ECF No. 93-1 at

¶¶ 53, 44(AF).)  On August 15, 2013, Esther Zuniga sent an email to Romney, informing her that

plaintiff's dress was "no bueno."  (ECF No. 79-18 at 1.)  In September 2013, Tony Clement notified

---

[14] The parties spend much time going back and forth as to whether Tony Clement had the authority
to warn or discipline plaintiff.  (*See* ECF No. 93-1 at ¶¶ 37(AF), 39-41(AF), 43(AF), 45(AF).)  In the
instant factual statement (number 45(AF)), plaintiff relies upon "Tony, pg. 131, ln. 19 – pg. 132, ln.1."
Presumably, this is referring to Tony Clement's deposition testimony.  Unfortunately for plaintiff, she fails
to cite to which of the 24 exhibits attached to her response she is referring.  Simply stating "Tony" does not
help very much.  To the extent that plaintiff is relying upon the deposition transcript of Tony Clement
attached to the motion for summary judgment, there is another problem.  That exhibit begins on page 133
and ends on page 136 of the transcript.  (*See* ECF No. 79-25.)  Seeing as plaintiff cites to pages 131 and
132 of the transcript this is obviously a problem.  In the future, plaintiff should do what this Court's Civil
Practice Standards (and common sense) dictate by citing to the specific exhibit number.  *See* Civil Practice
Standard IV.B.2.b.  To be fair, defendant does not do a better job.  In response to this factual statement,
defendant also cites to page 131 of the transcript.  (*See* ECF No. 93-1 at ¶ 45(AF).)  As they do throughout
their statements of material fact, defendant cites only to "[Name of deponent] Dep."  The Court's Civil
Practice Standards require citation to specific exhibit numbers, not names the parties have attached to
exhibits.  In the future, the Court would suggest defendant follow those instructions as well.  In any event,
whether the emails Tony Clement sent to plaintiff about violating the dress code can be characterized as
warnings or disciplinary actions is discussed *infra*.

Jeff Johnson ("Johnson"), a broker on the Jeff Ryder Team, that there had been complaints about plaintiff not being in compliance with the dress code. (ECF No. 93-1 at ¶ 57.) Tony Clement asked Johnson to address the issue, and Johnson responded that he did not think that her dress broke the dress code and the dress was "fine and appropriate." (*Id.*) When Ryder was out of the office, Johnson acted as plaintiff's supervisor. (*Id.* at ¶ 48(AF).)

On September 24, 2013, Romney accessed plaintiff's email account and observed that the account contained emails and documents from Ryder's personal email account. (*Id.* at ¶ 70.) Defendant had the authority to monitor plaintiff's emails on the company server. (*Id.* at ¶ 18(AF).) Ryder provided plaintiff with access to his email account and gave her his password. (*Id.* at ¶ 70.) It was part of plaintiff's job responsibilities to review Ryder's emails as he often did not review them himself. (*Id.*) On the same day, Romney told Ryder that plaintiff had accessed his email and obtained certain documents. (*Id.* at ¶ 72.)[15] Ryder believed what he was told about plaintiff accessing his email account. (*Id.* at ¶ 73.)[16] Joe and Tony Clement and defendant's attorney recommended that Ryder terminate plaintiff's employment. (*Id.* at ¶ 76.) Ryder, though, made the decision to terminate plaintiff. (*Id.*)[17] Ryder had prepared a termination letter before meeting with

---

[15] In another paragraph, plaintiff cites deposition testimony indicating that either Tony Clement or Lassen called Ryder about plaintiff accessing his emails. (*See* ECF No. 93-1 at ¶ 68(AF).) How that statement meshes with plaintiff's concession of the statement in paragraph 72, the Court is not sure. Whatever it may mean, it appears undisputed that one of defendant's employees contacted Ryder about the email issue. As for who, it does not appear to be overly important to the Court's joint employer analysis.

[16] Plaintiff objects to this factual statement (*see* ECF No. 93-1 at ¶ 73), but, as discussed *supra*, the Court will not consider that part of her affidavit providing purported support for her objection. As such, her objection is unsupported.

[17] Plaintiff objects to defendant's factual statement that Ryder made the decision to terminate her employment. (*See* ECF No. 93-1 at ¶ 76.) As far as the Court can discern, however, plaintiff's grounds for objecting all relate to Tony and Joe Clement and their attorney *recommending* that plaintiff be terminated; those grounds do not challenge the assertion that Ryder made the decision to terminate.

plaintiff.  (*Id.* at ¶ 69(AF).)  The letter stated that plaintiff's "position at RE/MAX Properties, Inc. is terminated immediately due to unauthorized removal of private and company information." (ECF No. 86-20 at 2.)  The letter was signed by Ryder.  (*Id*.)

Defendant did not have the authority to terminate plaintiff.  (*Id.* at ¶ 25.)[18]  Joe and Tony Clement "talked about dismissal, firing, things like that," and warning Ryder that they would fire plaintiff, and Ryder asked how they would fire plaintiff when she did not work for them.  (ECF No. 86-11 at 65:24-66:17.)  Joe and Tony Clement also said to Ryder, "one more time and [plaintiff's] gone."  (*Id* at 67:17-24.)

### 3.    Analysis

#### a.    Termination

The most important factor in the Court's analysis is the right to terminate an employment relationship.  *Knitter*, 758 F.3d at 1228.  As found *supra*, the facts and evidence presented to the Court in this case reflect that the right to terminate plaintiff's employment was Ryder's, not defendant's.  Plaintiff's counter argument does not withstand scrutiny.  In the RSUMF, plaintiff begins by relying upon Bachara's affidavit.  As stated *supra*, Bachara's belief about defendant's dress code policy is not helpful because it is not based upon any actual events.  In other words, Bachara does not claim of knowing anyone who has been terminated by defendants due to the dress code policy.  Thus, his belief is as useful as anyone else's or no one's.  The policy itself can be read, rather than relying upon Bachara's interpretation of it.

---

[18] The reasons for the Court's adoption of this factual statement will be discussed in further detail *infra*.  Suffice to say for now, the evidence to which plaintiff cites as disputing the factual statement has been stricken (Bachara's affidavit), does not relate to termination (plaintiff cites to evidence pertaining to discipline and the issuance of warnings), and a dress code policy, which although facially perhaps providing some support for plaintiff's position, is controverted by testimony from Ryder that defendant did not have the authority to terminate plaintiff.

Turning to that policy, as the Court noted *supra*, on its face it may give some support to plaintiff's position because the policy clearly states a third infraction of the same will be grounds for termination.  (*See* ECF No. 79-15 at 3.)  The problem for plaintiff is that the policy did not give defendant *actual* authority to terminate plaintiff.  That much is clear from Ryder's deposition testimony, where he testified that defendant was "stumped" by the fact that, because plaintiff did not work for defendant, "there didn't seem to be an avenue to which they could fire her."  (ECF No. 79-7 at 46:2-5.)  Even in the portion of Ryder's deposition transcript to which plaintiff cites (*see* ECF No. 93-1 at ¶ 65), Ryder testified that, when Tony and/or Joe Clement talked about dismissing plaintiff, he asked how they could do that when she did not work for them (*see* ECF No. 86-11 at 65:24-66:17).  In this light, the Court considers the language in the dress code policy about having grounds to terminate as being akin to the threats to discipline in *Knitter*—threats without actual authority.  *See Knitter*, 758 F.3d at 1231 (explaining that, although Picerne may have threatened to discipline Knitter, that did not mean they had actual authority to do so).[19]

The same conclusion is reached, and perhaps further supported, when taking into account plaintiff's other reason for objecting to this fact.  In the RSUMF, plaintiff asserts that defendant had the authority to issue warnings and other progressive discipline to her.  (ECF No. 93-1 at ¶ 25.)  Whether that is true will be discussed *supra*.  The important point with respect to the right to terminate, though, is that even if defendant could discipline her that does not create any dispute as to defendant's assertion that defendant did not have the authority to *terminate* plaintiff's employment.  The same is true of arguments in plaintiff's response to the motion for summary

---

[19] The same is true for Tony Clement's statement of "one more time and she's gone," referring to plaintiff.  (*See* ECF No. 93-1 at ¶ 144.)  In light of Ryder's testimony that plaintiff did not work for defendant, and there being no avenue for defendant to fire plaintiff, at best, Tony Clement's statement can be considered a threat with no teeth.

judgment.  Therein, plaintiff argues that defendant "wanted to fire" plaintiff.  (*See* ECF No. 86 at 3.)

However, the mere desire to want to terminate plaintiff does not mean that defendant had the right

to do so.  Plaintiff also argues that Joe and Tony Clement *recommended* that Ryder terminate

plaintiff.  (*Id*. at 4.)[20]  However, in no sense is the recommendation to terminate, the same thing as

having the actual authority to terminate.[21]

Who did have the authority to terminate plaintiff then?  The answer to that question is

abundantly clear from the record: it was Ryder.  Ryder testified that the decision to terminate was

his, he further testified that plaintiff worked for him and thus defendant could not fire her, and he

handed and signed the termination letter.  The evidence could not be any more clear.  To the extent

that plaintiff relies upon her own deposition testimony for the position that Ryder did not want to

terminate her (*see* ECF No. 93-1 at ¶ 159), that testimony is inadmissible hearsay, seeing as Ryder's

purported statement—that he did not want to terminate plaintiff—is an out-of-court statement

offered for the truth.  *See Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995) (stating

that "hearsay testimony that would be inadmissible at trial may not be included in an affidavit to

defeat summary judgment because a third party's description of a witness' supposed testimony is not

---

[20] In the RSUMF, plaintiff provides further support for her assertion about defendant's making a recommendation by citing to Ryder's response to an inquiry from the Equal Employment Opportunity Commission ("EEOC").  (*See* ECF No. 93-1 at ¶ 157.)  Defendant objects to this on the ground that the cited evidence does not show that Ryder responded to an inquiry of who recommended plaintiff's termination.  (*Id*.)  That may be true, but, giving plaintiff the benefit of the doubt, the Court will, for present purposes, assume that her version of Ryder's response is true.  The problem for plaintiff, though, is the very next response where Ryder states "I made the final decision."  (*See* ECF No. 86-14 at 2.)  Given that this response is under a heading for "Discharge," and the previous response apparently relates to plaintiff's termination, it can only be assumed that Ryder told the EEOC that he made the final decision to discharge plaintiff.  Simply put, plaintiff cannot have it both ways, and, as such, Ryder's response to the EEOC inquiry further damages her position, rather than supports it.

[21] The same is true of Ryder asking Tony Clement and Lassen whether the issue with the emails was enough to terminate plaintiff, and being given an affirmative response.  (*See* ECF No. 93-1 at ¶ 76.)  Nothing about that testimony refutes the fact that defendant did not have the right to terminate plaintiff.

suitable grist for the summary judgment mill.") (quotation and alterations omitted).  Moreover, if plaintiff wanted to present this fact in an admissible form, she could have easily done so—by citing Ryder's own deposition testimony.  The fact that she did not speaks for itself.

In light of all of the above, the Court finds that defendant did not have the right to terminate plaintiff, and that right was vested in Ryder alone.  Thus, this factor weighs against plaintiff.

### b.       Payment

Here, it is undisputed that Ryder alone paid plaintiff and Ryder alone issued plaintiff with W-2 Forms.  (ECF No. 93-1 at ¶¶ 15-16.)  Therefore, this factor weighs against plaintiff.

### c.       Benefits

It is further undisputed that defendant did not provide plaintiff with any benefits, and Ryder alone agreed to provide plaintiff with paid vacation and bonuses.  (*Id*. at ¶¶ 14, 17.)  Therefore, this factor weighs against plaintiff.

### d.       Supervision

The parties agree that Ryder and Johnson supervised plaintiff.  (*See* ECF No. 93-1 at ¶ 94.)  Neither Ryder or Johnson are employees of defendant.  Ryder is an independent contractor affiliated with defendant as the Jeff Ryder Team, and Johnson is a broker on the Jeff Ryder Team.  (*Id*. at ¶¶ 2, 57.)  The only issue with respect to supervision is whether Tony Clement, one of defendant's employees, also supervised plaintiff.  (*See id.* at ¶ 94.)  To support the assertion that Tony Clement supervised her, plaintiff cites her deposition testimony.  (*Id*. (citing ECF No. 86-6 at 60:21-23)).  More specifically, during her deposition, plaintiff was asked who her supervisors were.  In response, she stated: "Jeff Ryder; Jeff Johnson; at times, Tony Clement."  (ECF No. 86-6 at 60:21-24.)  Plaintiff was then asked when Tony Clement supervised her, and she responded: "Writing me up for a dress code violation," and "[d]eactivating my key."  (*Id*. at 60:25-61:3.)  With respect to the latter

statement, the Court provides it with little weight, given that plaintiff further testified that she did not know who deactivated her key.  (*Id*. at 61:8-14, 62:8-11.)

With respect to the former, it is undisputed that Tony Clement sent plaintiff two emails informing her that she had violated defendant's dress code policy.  (ECF No. 93-1 at ¶¶ 50, 52.)  The question then is whether informing plaintiff that she had violated the dress code constituted supervision.  This is similar to a question that will arise *infra* with respect to whether Tony Clement's emails constituted a warning or disciplinary action.  The questions are not exactly the same, however, as it is possible that Tony Clement could discipline plaintiff without actually supervising her and vice versa.  In any event, for present purposes, the Court does not believe that Tony Clement informing plaintiff of her purported dress code violations constituted supervision.  Notably, even though Tony Clement informed plaintiff of her purported violations and that she needed to go home and change, the record reflects that plaintiff did not go home and change because Ryder told her she did not need to.  (*See* ECF No. 93-1 at ¶ 53.)  As plaintiff states in response to this factual statement, she was not sent home "because Ryder concluded that her dress was not in violation of the dress code on either date."  (*Id*.)  In other words, to the extent that anyone supervised plaintiff's clothing, it was Ryder, given that Ryder apparently had final say on whether her clothing complied with the dress code.

Absent clothing and the building key, plaintiff's deposition testimony points to no other ways that Tony Clement, or defendant, supervised her.  Turning to the rest of the record, although there are some facts showing an element of control or monitoring of plaintiff's work, they do not overcome other facts in this regard.  Notably, the record shows that all of the work tasks plaintiff performed were done for the Jeff Ryder Team, and assigned by members of that team.  Plaintiff

reported her weekly hours to Ryder on a time sheet, and submitted requests for time off to Ryder. Although plaintiff had to know how to operate defendant's management system, and she had to turn in files and commission checks to defendant, the only evidence in the record is that plaintiff was trained by one of Ryder's assistants.

Plaintiff points to the fact that defendant gave her an office and that assistants were required to go through a "check in" process. The fact that plaintiff was given an office has no relevance as to whether defendant controlled or supervised her, especially given that plaintiff was working on defendant's premises. As for the check in process, the record reflects that defendant had a check in process for new assistants. However, the Court finds particularly noticeable that at no point does plaintiff allege that *she* took part in that process. Instead, all of her factual statements in that regard are written in the generic form pertaining to assistants in general. (*See* ECF No. 93-1 at ¶¶ 2-3.)

Facts potentially in plaintiff's favor are that defendant kept a file on plaintiff and the multiple occasions that defendant's employees spoke to plaintiff about her dress. However, there is no evidence in the record as to what reason the file was kept, or how the mere existence of a file on an individual gave defendant control over the terms and conditions of plaintiff's employment. As for the conversations between plaintiff and defendant's employees, they go to the purpose of the dress code policy. In *Knitter*, the Tenth Circuit concluded that it was "natural[]" for Picerne to supervise Knitter's workplace safety because she worked on Picerne's premises. *Knitter*, 758 F.3d at 1230. Here, the Court finds it similarly natural for defendant to enact and enforce a dress code policy given that plaintiff worked on its premises and the purpose of the policy was to "project [a] professional image" to clients. (*See* ECF No. 79-15 at 2-3.) The same is true of any dress-code related conversations that occurred prior to the adoption of the August 2, 2013 dress code. As the dress

code policy itself states: "Presenting a professional image is essential for the business success of all of our agents here at RE/MAX Properties Inc." (*Id.* at 2.) Thus, to the extent that defendant's dress code policies, and enforcement of the same, resulted in some element of control or supervision of plaintiff, it was consistent with the agency relationship of defendant's business, rather than an employer-employee relationship. *See Knitter*, 758 F.3d at 1230.

As a result, the Court finds that the supervision factor weighs against plaintiff.

### e.    Discipline

The Court reaches a similar finding with respect to any discipline that may have resulted from enforcement of defendant's dress code policy. As an initial matter, the only disciplinary events to which plaintiff points are those related to enforcement of the August 2, 2013 dress code policy. (*See* ECF No. 86 at 5.) As already noted, with respect to those events, the parties quibble over whether they constituted a warning or a disciplinary action. (*See* ECF No. 93-1 at ¶¶ 115, 117-119, 121, 123.) As far as the Court is concerned, resolving that semantic dispute is pointless because, even if Tony Clement's emails to plaintiff could be considered disciplinary action and even if he had the authority to do so under the policy, such actions were entirely consistent with the dress code's stated purpose of projecting a professional image. In addition, there is no evidence of any actual discipline being enforced upon plaintiff. Notably, it is undisputed that after both events, plaintiff was told to ignore the purported discipline—going home to change. Arguably, each purported violation of the dress code policy also put plaintiff one step closer to a third violation and grounds for termination, but, as already discussed, defendant had no actual authority to terminate plaintiff. Finally, as in *Knitter*, plaintiff points to no other evidence that defendant had authority to discipline plaintiff in other matters. *See Knitter*, 758 F.3d at 1231.

As a result, the Court finds that the discipline factor weighs against plaintiff.

### f.      Hiring

Although the Tenth Circuit in *Knitter* did not analyze in detail the issue of hiring, *see Knitter*, 756 F.3d at 1227-31, plaintiff brings it up in her response to the motion for summary judgment, so the Court will address it.   Contrary to plaintiff's assertions, defendant played no role in *her* hiring. Plaintiff's arguments in this regard are reminiscent of those with respect to the check in process.   In other words, *generally*, defendant requires pre-hiring approval.  (*See* ECF No. 86 at 5.)  The problem once again, though, is that the evidence in this case does not show that *plaintiff herself* was hired pursuant to any rules or policy of defendant.  Most important, it is undisputed that Ryder placed an ad seeking an assistant, and Ryder interviewed plaintiff for that position  (ECF No. 93-1 at ¶ 4.) None of defendant's employees were present at that interview, and plaintiff did not interview with anyone from defendant.  (*Id.* at ¶ 5.)  Finally, Ryder hired plaintiff at the conclusion of the interview. (*Id.* at ¶ 6.)   Although defendant's policy stated that all unlicensed assistants would meet with a broker manager before hiring (*id.* at ¶ 1(AF).), plaintiff did not do that.  Simply put, there is no other way, however liberally the facts are viewed in plaintiff's favor, to view the facts other than showing that Ryder, not defendant, hired plaintiff.

As a result, to the extent this factor is relevant to the analysis, it weighs against plaintiff.

### 4.      Summary

Having found that all of the factors potentially pertinent to the joint employer test weigh against plaintiff, the necessary conclusion is that no reasonable jury could find that defendant was plaintiff's joint employer.  As a result, Title VII does not afford plaintiff a remedy against defendant

for any alleged discrimination, harassment, or retaliation she may have faced in her job. *See Knitter*, 758 F.3d at 1231.

In addition, to the extent that plaintiff raises a claim based upon Joe Clement allegedly telling Bachara not to hire plaintiff after her termination (*see* ECF No. 86 at 17), this is much like the claim in *Knitter* pertaining to retaliatory actions against purportedly former employees. *See generally id.* at 1231-32. As in *Knitter*, because this Court has found that plaintiff was not an employee of defendant, plaintiff "is required to show she was an 'applicant for employment' with [defendant] to establish a claim for retaliatory rejection of her [hiring application] under Title VII." *See id.* at 1232 (quoting 42 U.S.C. § 2000e-3(a)) (alteration omitted). Here, plaintiff has presented no evidence, or even allegation, that, in responding to an advertisement for a "buyer's agent," she applied to be an employee of defendant. (*See* ECF No. 19 at ¶ 32.)

## B.  Single Employer Test

In her response to the motion for summary judgment, plaintiff briefly asserts that there is another basis for finding defendant to be her employer for purposes of Title VII: because Ryder and defendant established a single operation. (ECF No. 86 at 6-7.) The Court will not dwell long on this issue not least because plaintiff goes to no real effort to justify the argument. The argument is less than one page, and merely regurgitates a few of the facts from her analysis of the joint employer test. (*See id.*) Nonetheless, a brief discussion is appropriate. As plaintiff asserts, this test focuses on four factors related to the relationship between two potential employers; here, Ryder and defendant. *See Knitter*, 758 F.3d at 1226-27. Control of labor relations is considered the most important factor. *Bristol v. Bd. of Cnty. Comm'rs of Cnty. of Clear Creek*, 312 F.3d 1213, 1220 (10th Cir. 2002).[22]

---

[22] The Court notes that plaintiff *only* discusses the control of labor relations factor. Therefore, the Court finds that each of the other factors, to the extent relevant, weigh against plaintiff because any argument pertaining to them has been waived.

In light of the Court's analysis *supra* with respect to the joint employer test, the Court cannot find that defendant exercised control over labor relations with respect to plaintiff.  As discussed, each of the factors related to the terms and conditions of plaintiff's employment—termination, payment, benefits, supervision, discipline, and hiring—weigh against plaintiff, with some being particularly lop-sided.  Contrary to plaintiff's assertions, the evidence does not show that Ryder deferred to Joe and Tony Clement's disciplinary actions.  Rather, the record shows the exact opposite: where Tony Clement issued a purported disciplinary action, Ryder told plaintiff to ignore it and she did.[23] Furthermore, there is no evidence that Ryder "co-managed his team members," as all of plaintiff's work tasks were assigned by members of Ryder's team, and, even if Ryder "took management direction" with respect to plaintiff's termination, the evidence is clear that the final decision was made by Ryder alone.  In addition, the fact Ryder placed his team within defendant's premises is irrelevant to who had control of labor relations.  Finally, even if Ryder was unaware of meetings between plaintiff and defendant's employees, this still does not establish any control over labor relations, given that Ryder told plaintiff that she did not need to follow or did not violate any of defendant's dress code policies.

As a result, to the extent that plaintiff has properly raised the single employer issue, which the Court finds debatable at best, it is rejected as a basis for finding defendant to be plaintiff's employer for purposes of Title VII.

---

[23] This is one of the many reasons why plaintiff's factual statement that defendant "overrode" Ryder's authority is simply well wide of events on the ground.  (*See* ECF No. 93-1 at ¶ 46(AF).)  The mere fact that Ryder and defendant clearly *disagreed* over whether plaintiff had violated the dress code policy does not mean that defendant overrode Ryder's authority.  There is simply no evidence that Ryder was ever overrode; instead, as discussed, Ryder told plaintiff to ignore defendant's protestations about purported violations of the dress code.

IV.     **Conclusion**

For the reasons set forth herein, the Court:

(1)      GRANTS in part and DENIES in part defendant's motion to strike (ECF No. 94);

and

(2)      GRANTS defendant's motion for summary judgment (ECF No. 79).

The Orders Setting a Trial Preparation Conference and Setting Case for Trial (ECF Nos. 91, 99) are VACATED.

The Clerk is directed to enter Judgment in favor of defendant DISMISSING this case.


**SO ORDERED.**

DATED this 28th day of February, 2017.


BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge

26